IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| ORBITAL ENGINEERING, INC., ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs ) | Civil Action No. 20-593 |
| ) | |
| ) | |
| JEFFREY J. BUCHKO, ) | |
| ) | |
| Defendant. ) | |

MEMORANDUM OPINION

In this action, Plaintiff Orbital Engineering, Inc. ("Orbital") asserts claims against defendant Jeffrey J. Buchko ("Buchko"), its former Chief Operating Officer ("COO"), for breach of contract and declaratory relief. Orbital alleges that it is not obligated to make certain contractual payments to Buchko that otherwise would be required because it terminated him for intentional or willful misconduct or gross negligence. It also seeks a declaration that because Buchko was terminated for willful misconduct, he is bound by the terms of a noncompete agreement ("NCA") he entered into with Orbital until March 2, 2022.

In turn, Buchko has asserted counterclaims for breach of contract, tortious interference with contractual relations, defamation and payment of a bonus and unused vacation days under the Wage Payment and Collection Law, and also seeks a declaration that the NCA is unenforceable.

Pending before the Court is Buchko's motion for partial summary judgment (ECF No. 151). In his motion, he seeks a ruling that he did not engage in willful misconduct, as well as a ruling that Orbital is enjoined from further conduct to interfere with his efforts to seek employment. His motion has been fully briefed and oral argument was held on September 27, 2021. For the

reasons that follow, his motion will be denied.[1]

## I. Brief Procedural History

Orbital commenced this action in April 2020. In June 2020, Buchko filed an Answer and Counterclaims which was later amended. The parties engaged thereafter in discovery. After the close of discovery, both parties moved for partial summary judgment.[2]

## II. Relevant Factual Background

### A. Buchko's Positions and Duties with Orbital

Buchko was hired by Orbital as a Civil/Structural Department Manager in 2008. Later, he was promoted within the company, including serving as Vice President of Operations. In August 2015, he became Orbital's COO. As COO, Buchko was ultimately responsible for operations at all Orbital locations, and he also assumed certain responsibilities for information technology ("IT") and Operational Safety. (Defendant's Concise Statement of Material Facts ("DCSMF") ¶¶ 1-3 (ECF No. 188).) The parties dispute whether Buchko merely had administrative oversight for IT or full responsibility. (*Id.*; Plaintiff's Statement of Disputed Facts and Additional Facts Precluding Summary Judgment ("PSDF" ¶ 3 (ECF No. 226).)

Between August 2016 through July 2018, Buchko agreed to temporarily relocate, along with his family, to work at Orbital's location in Pittsburgh, Pennsylvania. During that time frame, the President of Orbital, Don Henrich ("Henrich"), transitioned to a part-time status with far less responsibilities, and by 2018, was semi-retired. Although he retained the title of President, Henrich focused mostly on business development and began moving his responsibilities to Buchko.

After a two-year stint in Pittsburgh ended, Buchko and his family returned to Indiana,

---

[1] The parties have consented to full jurisdiction before a magistrate judge pursuant to 28 U.S.C. § 636(c)(1).
[2] Orbital's motion for partial summary judgment is addressed in a separate opinion and order.

where he retained the same roles and responsibilities he held in Pittsburgh. According to Orbital, Buchko's time in Pittsburgh was not an agreed-upon two-year period; rather, Buchko informed Orbital's CEO, Robert Lewis, that he was unwilling to remain in Pittsburgh and wanted to return to Hammond "around Christmas of 2017." (PSDF ¶¶ 7, 9.)

Buchko states that, beginning in early 2019, Robert Lewis persistently tried to convince him to permanently relocate to Pittsburgh so he could assume the role as President of Orbital and made it clear that Buchko had to permanently relocate to Pittsburgh to become President. He asserts that because he refused to relocate his family for the third time in three years, Robert Lewis took his refusal to be disrespectful and demonstrating a lack of commitment to Orbital. (DCSMF ¶¶ 15-18.) In contrast, Orbital notes that Robert Lewis testified that Buchko was disrespectful and showed his lack of commitment to Orbital in four specific respects, which represent the willful misconduct that ultimately led to Buchko's termination. (PSDF ¶ 18.)

At the end of its 2019 fiscal year, Orbital reported the highest gross revenue in its history. Buchko's achievements were highlighted as part of Orbital's 50th anniversary celebration. According to Orbital, Buchko, who was largely responsible for the book that commemorated Company's 50th anniversary, gave himself credit for the Company's success. Buchko asserts that he continued to receive accolades and bonuses for his work at Orbital through the end of 2019 (DCSMF ¶¶ 4-9), although Orbital counters that the only bonus Buchko received during 2019 was a Christmas bonus that paid to all Orbital executives and general managers. (PSDF ¶¶ 8-9.)

    B.  The Confidentiality and Non-Compete Agreement

In the first ten years of his employment, Buchko and Orbital were not parties to any agreements about their post-employment rights and duties. It was not until Buchko returned to Hammond, Indiana that he was presented with a Confidentiality and Non-Compete Agreement

("NCA") to sign. (DCSMF ¶¶ 10-11.) The NCA provides, in relevant part, as follows:

\* \* \* \* \*

2. *Non-Competition and Non-Solicitation.* Employee covenants and agrees that while employed by the Company and for a period of twenty-four (24) months after termination of such employment, whether the termination is voluntary or involuntary and regardless of the reason therefor, Employee will not engage in any of the following activities:

(a) Provide services as an employee, business owner, consultant or independent contractor for any entity which is or plans to become, in whole or in part, engaged in any Competitive Business Activity within 75 miles of Chicago, Illinois and 75 miles of Hammond, Indiana.

\* \* \* \* \*

If employee is terminated within twenty-four (24) months of the effective date of this Agreement, for anything other than willful misconduct as described by the Company handbook (i.e., Employee Policies and Benefits, Revised June 15, 2016), the terms of the non-competition provisions of this Section 2 shall be reduced to twelve (12) months. All other provisions in this Section 2, as well as the other portions of this Agreement, shall remain in full force and effect.

(ECF No. 189 Ex. A ¶ 2.)  Buchko signed the NCA on May 29, 2018. (PSDF ¶ 155.)[3]

Orbital's Employee Handbook includes a section relating to employee conduct. In general, this section describes Orbital's expectations about its employees' conduct. that It also provides "examples of willful misconduct" that are prohibited when the employee is representing the company. The handbook then lists twenty-three examples, including:

- Negligent use of and/or intentional damage to company property including falsifying, destroying or concealing company records;

- Failure to adhere to safety/security regulations and procedures;

- Failure to maintain the confidentiality of company information or business records;

---

[3] The parties dispute various issues about the NCA, including whether Buchko had counsel, signed it under duress and received adequate consideration. These issues are not germaine to the resolution of Buchko's motion for summary judgment.

4

- Refusal to follow management's directions or instructions concerning any job-related function; and

- Insubordination.

(PSDF ¶¶ 166, 326; ECF No. 226 Ex. 31, § 1.7.) The list is described as "non-exhaustive." While the Employee Handbook was revised as of January 1, 2019, the language regarding willful misconduct was not changed. (*Id.* ¶ 167; ECF No. 226 Ex. 32, § 1.8.)

### C. Buchko's Termination

On January 2, 2020, Orbital's Chief Legal Officer, Dylan Lewis and Orbital's Chief Financial Officer, Brandon Otis ("Otis"), met with Robert Lewis at his home in Florida to discuss Buchko's future with Orbital. During this meeting, Dylan Lewis presented three options concerning Buchko's future with the Company: 1) allow Buchko to remain as COO; 2) demote him to a sales position; or 3) terminate him. Robert Lewis made the decision at this meeting to terminate Buchko. (DCSMF ¶¶ 19-21.)

The parties dispute the basis for Robert Lewis' decision. Buchko contends that the reasons he was terminated was because: after all of the "great things [ Lewis] had done for him and helped his family[,]" Buchko "was disrespectful[,]" and Robert Lewis "didn't like it"; Buchko would not relocate to Pittsburgh; and Lewis believed Buchko "[w]asn't committed" to Orbital. (*Id.* ¶ 22.) Orbital counters that in contrast to Buchko's selective quotations from Robert Lewis's deposition, a complete review of his testimony confirms that he decided to terminate Buchko based on Buchko's willful misconduct, citing his refusal to report to Dylan Lewis, his refusal to spend 2-3 days a week at the Detroit office, his refusal to support Thomas Evans and Orbital subsidiary Orbital Technical Solutions ("OTS") and his failure to properly oversee IT cybersecurity. (PSDF ¶ 22.)

Orbital did not terminate Buchko until two months after the decision was made to do so.

As a result, he had continued access to Orbital's Confidential Information, including the "Company's DelTek management system," and was still issuing and receiving "detailed reports concerning the Company's cost and pricing information, budgeting analysis and forecasts, financial performance data, detailed personnel information as well as information relating to the Company's historical, current and upcoming business opportunities." (DCSMF ¶¶ 23-24.)

Buchko unexpectedly received a termination letter from Orbital. He was notified in this letter that his conduct was unacceptable and that he was being terminated for unspecified "willful misconduct." (DCSMF ¶ 25.) Although it did not identify this conduct, Orbital contends that Buchko had received directives from Orbital's management many times and repeatedly refused to comply with those directives. (PSDF ¶ 25.) Orbital's termination letter also advised Buchko that while he was not entitled to the severance benefits of the NCA or any bonus that had accrued, he was bound by the non-competition and non-solicitation provisions of the NCA. (DCSMF ¶ 26.)

In a letter dated March 26, 2020, counsel for Buchko disputed Orbital's termination decision. It also indicated that unless Orbital confirmed within ten days that it would pay Buchko his full severance and other payments that were owed to him, Buchko would consider Orbital to have breached the NCA and so he would have no further obligation to honor his post-employment contractual obligations to Orbital. (PSDF ¶ 337.)

In its April 6, 2020 response, Orbital provided Buchko a list of fifteen specific occurrences of willful misconduct in which he had allegedly engaged while employed at Orbital that led to his eventual termination. Thereafter, Orbital commenced this suit against Buchko, seeking to enforce the NCA. The Complaint does not identify any examples of willful misconduct and merely lists all twenty-three examples listed in the Employee Handbook.[4] (DCSMF ¶¶ 27-28; Compl. ¶ 14.)

---

[4] Buchko contends that, at least by implication, Orbital's Complaint accused him of all twenty-

6

**III.    Discussion**

   A. <u>Standard of Review</u>

The Federal Rules of Civil Procedure provide that: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Summary judgment may be granted against a party who fails to adduce facts sufficient to establish the existence of any element essential to that party's case, and for which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party bears the initial burden of identifying evidence which shows the lack of a genuine issue of material fact. Once that burden has been met, the non-moving party must set forth "specific facts showing that there is a genuine issue for trial" or the factual record will be taken as presented by the moving party and judgment will be entered as a matter of law. *Matsushita Elec. Indus. Corp. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). An issue is genuine only if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The Court of Appeals has held that "where the movant bears the burden of proof at trial and the motion does not establish the absence of a genuine factual issue, the district court should deny summary judgment even if no opposing evidentiary matter is presented." *Nat'l State Bank v. Federal Rsrv. Bank,* 979 F.2d 1579, 1582 (3d Cir. 1992).

In following this directive, a court must take the facts in the light most favorable to the non-moving party, and must draw all reasonable inferences and resolve all doubts in that party's

---

three examples of willful misconduct. (DCSMF ¶ 29.) He also contends that over the course of this litigation, Orbital has repeatedly changed the basis for its termination by citing twelve, then eleven, and finally four specific allegations that it contends are willful misconduct. (DCSMF ¶¶ 30-33.) Orbital denies that it has done so but simply removed a "catch-all" and narrowed the list of examples for streamlining. (PSDF ¶¶ 30-33.)

favor. *Hugh v. Butler County Fam. YMCA*, 418 F.3d 265, 266 (3d Cir. 2005); *Doe v. County of Centre, Pa.*, 242 F.3d 437, 446 (3d Cir. 2001).

    B.  <u>Willful Misconduct</u>

In moving for summary judgment on the issue of willful misconduct, Buchko contends that whether an employee's actions represent willful misconduct is a question of law that the court must decide.[5] He argues that to find that conduct was willful requires an intention to harm the company as opposed to mere unsatisfactory job performance, and that the four examples on which Orbital relies do not meet this standard. He therefore argues that this issue should be resolved in his favor.

Orbital disagrees, asserting that whether Buchko engaged in willful misconduct is an issue of fact, and because there are disputed facts about his job performance, this issue must be resolved by a jury.

The NCA provides, among other things, that if Buchko is terminated within twenty-four months of its effective date "for anything other than willful misconduct as described by the Company handbook (i.e., Employee Policies and Benefits, Revised June 15, 2016)," the term of the non-competition provisions is limited to twelve months. (ECF No. 189 Ex. A ¶ 2, p. 3.) Buchko's termination was within this twenty-four-month period. Thus, a key dispute is the length of time, if any, that Buchko is bound by the noncompete term in the NCA. This issue hinges on whether Buchko engaged in willful misconduct.

The parties' agreement explicitly provides that the meaning of "willful misconduct" is "as described by the Company handbook." As noted, the Employee Handbook provides twenty-three

---

[5] Buchko also argues that his request for declaratory relief is sufficiently ripe to constitute a "controversy." Orbital does not dispute this issue.

"examples" of willful misconduct, the list of which is "non-exhaustive."

As the Pennsylvania Supreme Court has stated, "we recognize parties have the right to make their own contract, and it is not the function of this Court to re-write it, or to give it a construction in conflict with the accepted and plain meaning of the language used." *Gamesa Energy USA, LLC v. Ten Penn Ctr. Assocs., L.P.*, 217 A.3d 1227, 1238 (Pa. 2019) (citation omitted). Neither party has argued in their memoranda that the definition of willful misconduct in either the NCA or the Employee Handbook is ambiguous. Buchko does contend that the Employee Handbook does not define willful misconduct but only provides "examples." In asserting that Buchko was terminated for engaging in willful misconduct, however, Orbital states that is relying on certain specific examples in the Employee Handbook. While any attempt by Orbital to label conduct by Buchko outside of these examples as willful would require further analysis of its adequacy and ambiguity, Orbital has, in fact, cited certain of the specific "examples" identified in the Employee Handbook as the basis for Buchko's termination. Thus, to the extent that Orbital relies on the "examples," its stated reasons are not ambiguous. Whether the facts on which it relies are sufficient or whether the complained-of conduct fits within specific examples are different questions.

In support of his position that a determination of willful misconduct is a question of law, Buchko relies on judicial definitions of willful misconduct in the context of such issues as unemployment compensation, worker's compensation and civil service. *See, e.g.*, *McLean v. Unemployment Comp. Bd. of Rev.*, 383 A.2d 533, 535 (Pa. 1978); *Ruder v. Pequea Valley School Dist.*, 790 F. Supp. 2d 377, 400-01 (E.D. Pa. 2011); *Renk v. City of Pittsburgh*, 641 A.2d 289, 293 (Pa. 1994). He then argues that the conduct on which Orbital relies is not, by definition, willful. Without any agreement between the parties, this argument has merit. However, the fundamental

9

problem with Buchko's analysis is that unlike those cases in which it was necessary to supply a meaning, Orbital and Buchko entered into a contract that defines, at least in part, willful misconduct. Both parties are bound by their agreement about its meaning and cannot rely on definitions of willful misconduct in some other context. Thus, the definition of willful misconduct described in the Employee Handbook applies. *See H&R Block Eastern Tax Serv., Inc. v. Zarilla*, 69 A.3d 246, 251 (Pa. Super. 2013) (upholding employer's termination of employee for cause because of violations of clearly stated terms and policies in an employment agreement and handbook); *Dobinsky v. Crompton & Knowles Colors, Inc.*, 2004 WL 2303686, at *3 (M.D. Pa. Mar. 30, 2004) (applying employment contract's definition of "cause" to guide analysis of breach of contract claim); *O'Malley v. Wire Weld, Inc.*, 2012 WL 425791, at *7 (W.D. Pa. Feb. 9, 2012) (evaluating whether employee's termination for cause was proper based on the contractual definition of "termination for cause" in employment agreement); *DeMuth v. Miller*, 652 A.2d 891, 892-93, 900 (Pa. Super. 1995).

Buchko also argues that because the term "willful misconduct" contains a necessary element of intentionality, mere disagreements about what was in the best interests of Orbital do not show the requisite intent to harm Orbital. He quotes the following statement from the Pennsylvania Superior Court:

> "Willful misconduct" is not defined in the law, but it has been held to comprehend an act of wanton or willful disregard of the employer's interest, a deliberate violation of the employer's rules, a disregard of standards of behavior which the employer has a right to expect of an employe, or negligence indicating an intentional disregard of the employer's interest or of the employe's duties and obligations to the employer.

*Moyer v. Unemployment Comp. Bd. of Rev.*, 110 A.2d 753, 754 (Pa. Super. 1955). *See also Evans v. Philadelphia Transp. Co.*, 212 A.2d 440, 443 (Pa. 1965). And, he argues, the Pennsylvania Supreme Court has held that "an employer cannot demonstrate willful misconduct by merely

showing that an employee committed a negligent act, but instead must present evidence indicating that the conduct was of an intentional and deliberate nature." *Myers v. Unemployment Comp. Bd. of Rev.*, 625 A.2d 622, 625 (Pa. 1993) (citation omitted). *See also Coleman v. Unemployment Comp. Bd. of Rev.*, 407 A.2d 130, 131-32 (Pa. Commw. 1979). As discussed above, however, these definitions were supplied by the court, not by the parties in their agreement.

Moreover, to the extent that Buchko contends that Orbital must show that his actions were intended to harm the Company, this position conflicts with the definition of willful misconduct in Orbital's Employee Handbook. While many examples of willful misconduct in the Employee Handbook involve intentional acts, some do not necessarily involve an "intent to harm the Company." For example, insubordination and refusal to follow directives are intentional acts, but there is no basis for concluding that they must be done with an intent to harm Orbital to represent willful misconduct *as defined by the parties.*

Buchko argues that an interpretation of a writing's terms cannot lead to an absurd or unreasonable outcome. *See Bohler-Uddeholm Am., Inc. v. Ellwood Group, Inc.*, 247 F.3d 79, 96 (3d Cir. 2000). Among other things, he appears to contend that Orbital's position is unreasonable because the broad language of the Employee Handbook allows it to assert that virtually any conduct can be characterized as "willful misconduct" if Orbital so chooses. That may be true. However, Orbital contends here that Buchko's conduct falls within the specific examples of willful misconduct in the handbook, at least some of which involve intentional conduct. Ultimately, of course, the jury will have to determine the nature of Buchko's actions.

The Court finds that there are genuine issues of material fact as to issues related to Buchko's alleged willful conduct. That includes whether he refused to spend more time in the Detroit office. Buchko contends that Robert Lewis merely suggested that Buchko needed to spend

more time in the Detroit office but Buchko disagreed that this was in the best interests of the Company. Orbital has submitted conflicting evidence that Buchko was given an explicit instruction to report to the Detroit office more frequently and refused to comply. *Compare* PSDF ¶¶ 95-101, 271-80 *with* DCSMF ¶¶ 95-101.[6] *See also* Defendant/Counterclaimant's Response to Plaintiff/ Counterdefendant's Additional Facts ("DRPAF") ¶¶ 271-80. (ECF No. 247.)

This conflicting testimony compels the conclusion that this material issue, among others, must be presented to the jury for resolution.[7] The trier of fact will determine whether Buchko's decision about the amount of time to spend in the Detroit office was merely a disagreement among members of Orbital senior management or represented insubordination or "refusal to follow management's directions or instructions concerning any job-related function," both of which are examples of willful misconduct in the Employee Handbook. The same analysis applies to other

---

[6] Buchko notes that Orbital has no evidence that he was informed in writing that he was required to spend 2-3 days a week at the Detroit office or that his decision not to do so represents willful misconduct (DCSMF ¶¶ 91, 93-94; DRPAF ¶ 336). The NCA does not require notice to Buchko of willful misconduct before he can be terminated, however. At the same time, Bucko may present evidence at trial about any significance to this lack of notice or of Orbital's policy, if any, about how it handles unacceptable conduct by employees.

[7] Buchko notes that much of Orbital's evidence is based on declarations signed by Dylan Lewis and Otis after the close of discovery which include facts to which they did not testify in their depositions. He argues that this tactic avoided cross-examination on these facts in contravention of the discovery process and asks the Court to reject these declarations. (DRPAF ¶¶ 266, 271, 274, 278, 280, 287, 290, 296-99, 316, 325, 336.) However, while a deponent has an obligation to correct his testimony, there is no obligation to supplement deposition testimony nor is there any blanket prohibition on submitting declarations after the close of discovery. *See Estate of Fajge v. Dick Greenfield Dodge, Inc.*, 2012 WL 2339723, at *11 (D.N.J. June 18, 2012). Buchko does not contend that the declarations contradict prior deposition testimony, which would invoke the "sham affidavit doctrine." *See Daubert v. NRA Grp., LLC*, 861 F.3d 382, 391 (3d Cir. 2017). Moreover, Buchko has not cited examples where the declarants introduced new facts not discussed at their depositions. In fact, a review of depositions of Dylan Lewis and Otis indicates that they did testify about these matters. See ECF No. 226 Ex. 8 at 95 (Lewis), Ex. 10 at 41 (Otis). Moreover, Robert Lewis testified at his deposition about these matters. Thus, even without these declarations, Orbital has introduced evidence of genuine issues of material fact. Any comparison or contrast between the declarations and the declarant's testimony may be explored through cross-examination.

genuine issues of material fact about Buchko's alleged willful misconduct, including (1) whether Buchko either reported or refused to report to Dylan Lewis and keep him apprised on various matters as instructed (s*ee* PSDF ¶¶ 79, 82, 84-90, 264, 266-70; DCSMF ¶¶ 82, 84-90; DRPAF ¶¶ 264, 266-70); (2) whether Buchko refused to cede authority to and tried to undermine newly hired Chief Technical Officer Thomas Evans and his leadership of Orbital subsidiary OTS (PSDF ¶¶ 102-16, 281-307), or if Buchko was expected to stay involved with OTS. (DCSMF ¶¶ 102-16; DRPAF ¶¶ 281-307.); and (3) whether Buchko refused to provide guidance and support to new Executive Vice President of International Operations Arno Wainikainen and excluded him from regularly scheduled sales and general manager calls (PSDF ¶¶ 118-24, 309-12), or by contrast, if it was Dylan. Lewis's responsibility to provide support to Wainikainen, Buchko was never given any directives about Wainikainen and he included Wainikainen in the biweekly GM meetings. (DCSMF ¶¶ 118-24; DRPAF ¶¶ 309-12 .)[8]

In its memorandum, Orbital also argues at some length that Buchko's refusal and failure to oversee Orbital's IT and cybersecurity functions also represented willful misconduct. Certainly, there are disputed issues of fact regarding these issues. (*Compare, e.g.*, PSDF ¶¶ 173-263 *with* DRPAF ¶¶ 173-263.) Notably, Orbital has not explained how Buchko's actions or omissions constitute any of the examples in the Employee Handbook that it has identified as relevant here, including insubordination, refusal to follow management's instructions or directions about any job-related function or any other example of "willful misconduct" cited by Orbital from the Employee Handbook.[9] While not the subject of Buchko's motion, Orbital has the burden of doing

---

[8] Some of allegations about Buchko's interactions with Wainikainen appear to have taken place after the decision was made to terminate Buchko's employment on January 2, 2020.

[9] Orbital makes no attempt to connect Buchko's alleged acts or omissions with "negligent use or and/or intentional damage to company property," "failure to adhere to safety/security regulations and procedures" or "failure to maintain the confidentiality of company information or business

so at trial.

Finally, Orbital cites actions allegedly taken by Buchko between January 2 and March 3, 2020 and claims that they "only reinforced the Company's decision" to terminate him. (PSDF ¶ 334.) This includes his alleged refusal to implement expense auditing software and policies, refusal to install antivirus software and the encryption of his computer and perhaps some aspects of his interactions with Wainikainen. (ECF No. 225 at 38.) Since these actions were taken by Buchko *after* the decision was made to terminate him, however, they could not have informed the Company's decision on January 2, 2020 or represented the alleged willful misconduct supporting that decision.[10]

In short, disputed issues of material fact related to Buchko's conduct, including his alleged insubordination and refusal to follow management's directions or instructions, preclude summary judgment in Buchko's favor. Thew finder of fact must determine whether Buchko engaged in willful misconduct.

Finally, the Court declines to enter an order at this stage of the proceedings that enjoins Orbital from interfering with Bucko's employment opportunities. If it is determined that Buchko was properly terminated for willful misconduct, the noncompete provisions remain in effect until March 2022. As discussed, the Court cannot determine the merits of Orbital's contention based on the record. Thus, while Buchko is not restrained from non-competitive employment that is not

---

records." Rather, it merely states these alleged acts or omissions as conclusions. ECF No. 225 at 13, 40. Notably, as Buchko points out in his response to Orbital's motion for partial summary judgment, Dylan Lewis admitted that Orbital did not terminate his employment based on his "failure to maintain the confidentiality of company information or business records" (ECF No. 223 ¶ 65). Orbital's only dispute with this statement is that Lewis was testifying in his personal capacity (ECF No. 245 ¶ 65).

[10] Employers in employment discrimination cases can raise "after-acquired evidence" but only to reduce damages, not to rebut the evidence of discrimination. *See McKennon v. Nashville Banner Pub. Co.*, 513 U.S. 352, 362-63 (1995). This is not a discrimination case.

precluded by the NCA, the Court cannot grant the injunctive relief he seeks.

For these reasons, Defendant's Motion for Summary Judgment (ECF No. 151) will be denied.

An appropriate order follows.

BY THE COURT:

/s/Patricia L. Dodge
PATRICIA L. DODGE
United States Magistrate Judge

Dated: November 12, 2021