IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

ORBITAL ENGINEERING, INC.,           )
                                     )
                    Plaintiff,       )
                                     )
vs                                   )        Civil Action No. 20-593
                                     )
                                     )
JEFFREY J. BUCHKO,                   )
                                     )
                    Defendant.       )

## MEMORANDUM OPINION

Plaintiff Orbital Engineering, Inc. ("Orbital") brings this action in which it asserts claims against defendant Jeffrey J. Buchko ("Buchko"), its former Chief Operating Officer ("COO"). Orbital seeks a declaration that because Buchko was terminated for willful misconduct, he is bound by the terms of a noncompete agreement for a two-year period. Orbital also alleges that it is not obligated to make certain contractual payments to Buchko that otherwise would be required because of the basis for his termination.

Buchko denies that he engaged in any willful misconduct or that Orbital is entitled to any relief and asserts various counterclaims against Orbital.

Pending before the Court is Orbital's motion for partial summary judgment (ECF No. 161). Orbital seeks judgment as a matter of law on most of Buchko's counterclaims and requests for damages. Its motion is fully briefed and oral argument was held on September 27, 2021. For the reasons that follow, Orbital's motion will be granted in part and denied in part.

## I.    Relevant Procedural History

Orbital commenced this action in April 2020, invoking diversity jurisdiction. Its Complaint includes claims for breach of contract and declaratory relief. Buchko's Answer and Counterclaims,

which was later amended (ECF No. 36), asserts causes of action for breach of contract, tortious interference with contractual relations, defamation and violation of the Pennsylvania Wage Payment and Collection Law, 43 P.S. §§ 260.1 to 260.10 ("WPCL"). He also seeks a declaration that the non-competition agreement is unenforceable.

At the close of discovery, both parties filed partial motions for summary judgment. Buchko's motion for partial summary judgment is addressed in a separate opinion and order.

## II.   Relevant Factual Background

### A.   The Parties and Their Relationship

Orbital is a Pennsylvania corporation that provides full-service solutions in engineering and design, construction management and QA/QC, safety and asset integrity services. It employs engineering and support staff members across six major offices, including those in Pittsburgh, Pennsylvania, Hammond, Indiana and Detroit, Michigan. Buchko was employed by Orbital beginning in 2008. Between 2015 and March 2020, he served as Orbital's COO. (Plaintiff's Concise Statement of Material Facts ("PCSMF") ¶¶ 1-4 (ECF No. 169).)

On May 29, 2018, while employed by Orbital, Buchko signed a Confidentiality and Non-Compete Agreement ("NCA"), several provisions of which are relevant to the resolution of the parties' disputes. As stated in its introductory paragraph:

> WHEREAS, the Company has extended to Employee, conditioned upon Employee's entering into this Confidentiality and Non-Compete Agreement, various new and additional benefits, some of which include: an increase in base salary from $200,000.00 to $300,000.00; an increase in vacation from three (3) weeks to four (4) weeks; an agreement to provide six months of salary and six months of COBRA healthcare coverage if terminated, unless for gross negligence or intentional or willful misconduct; and, eligibility to participate in the Company's bonus plan as defined and promulgated by Company's CFO.

(*Id.* ¶ 5.) The NCA includes Buchko's agreement that while employed by Orbital and for a two-year period after the termination of his employment, regardless of whether voluntary or

involuntary, he will not engage in certain activities. These restricted activities include providing

services for an entity engaged in "Competitive Business Activity," as defined in the NCA, within

75 miles of Chicago, Illinois or Hammond, Indiana. The NCA also provides that:

> If employee is terminated within twenty-four (24) months of the effective date of this Agreement, for anything other than willful misconduct as described by the Company handbook (i.e., Employee Policies and Benefits, Revised June 15, 2016), the terms of the non-competition provisions of this Section 2 shall be reduced to twelve (12) months. All other provisions in this Section 2, as well as the other portions of this Agreement, shall remain in full force and effect.

(ECF No. 224 Ex. A ¶ 2(a).)

Orbital's handbook (i.e., Employee Policies and Benefits, Revised June 15, 2016)

("Employee Handbook") that is referenced in the NCA includes a section entitled "Employee

Conduct." This section states, among other things, that "the following are examples of willful

misconduct." It then lists twenty-three "examples" of willful misconduct.[1] This paragraph then

states that "[t]his list is non-exhaustive and may warrant a variety of actions, including, but not

limited to, suspension and termination." (ECF No. 224 Ex. JJJ, § 1.7.) Although the Employee

Handbook was revised effective January 1, 2019, the definition of willful misconduct remained

---

[1] The twenty-three examples are: harassment, sexual or otherwise; discrimination; violation of Conflict of Interest Policy; solicitation of outside work from customers; excessive absenteeism, tardiness, or failure to come to work, or leaving company premises during work hours without permission; abusive or unauthorized use of company supplies and equipment; negligent use of and/or intentional damage to company property including falsifying, destroying or concealing company records; foul and offensive language directed towards fellow employees, clientele, or used generally in the workplace; failure to adhere to safety/security regulations and procedures; Failure to immediately report an accident or job related injury; reckless driving while operating company vehicles, or traveling on company time; unauthorized use, or use which is beyond the scope of one's employment, of company vehicles; any violation of the company Drug and Alcohol Policy; falsifying employment or any other company records; submitting a fraudulent injury claim; failure to maintain the confidentiality of company information or business records; gambling on company property; possession, sale or use of firearms or other weapons on company premises or while on company business; refusal to follow management's directions or instructions concerning and job-related function; insubordination; embezzlement of funds; theft of any company, client or employee property; and threats or acts of physical violence.

unchanged. (ECF No. 169 Ex. 11, § 1.8.)

The NCA also provides that it may not be modified, amended or terminated orally, but only by a written agreement signed both by an officer of Orbital and Buchko. (ECF No. 224 Ex. A ¶ 8(c).) The NCA was not modified or amended in writing after Buchko signed it in 2018. Defendant's Response to Plaintiff's Concise Statement of Material Facts ("DRPCSMF") ¶¶ 49-52 (ECF No. 223).

B.  Orbital Terminates Buchko's Employment

The decision to terminate Buchko was made by Orbital Chief Executive Officer Robert Lewis on January 2, 2020. It was not until March 2, 2020, however, that Orbital notified Buchko that it was terminating his employment. This was within twenty-four months of the effective date of the NCA. In its March 2, 2020 termination letter, Orbital informed him that he was being terminated as a result of his "repeated willful violations of the Company's employee standards of conduct." Orbital did not identify the nature of this conduct. In a March 26, 2020 response, Buchko, through his counsel, disputed the Company's termination decision and stated that unless Orbital confirmed within ten days that it would pay Buchko his full severance and other payments, Buchko would consider Orbital to have breached the NCA. Orbital was also advised of Buchko's position that he would have no further duty to honor his post-employment contractual obligations. (PCSMF ¶¶ 6-8; DRPCSMF ¶¶ 6-8.) Buchko contends that he was fired not for willful misconduct but for personal reasons, and that he was not notified of any performance issues before being terminated. (DRPCSMF ¶¶ 68-71.)[2]

In an April 6, 2020 response, Orbital's counsel asserted that Buchko was bound by the two-

---

[2] Those issues are discussed in the opinion addressing Buchko's motion for summary judgment and are not directly relevant to this motion.

4

year noncompete provision of the NCA. Further, its letter provided fifteen examples of "willful misconduct" in which Orbital contended Buchko had engaged during his employment and as a result, Orbital contended that he was not entitled to his full severance and other payments. (ECF No. 189 Ex. K.)

Soon after, Orbital commenced this action against Buchko in which it seeks to enforce the NCA. (PCSMF ¶ 9; DRPCSMF ¶ 58.) Its Complaint alleges that Buchko engaged in willful misconduct and quotes all twenty-three examples of willful misconduct from Orbital's Employee Handbook, but does not specify the misconduct in which it alleges Buchko engaged. (ECF No. 1 ¶ 14.)

The relevant facts about the counterclaims for which Orbital seeks summary judgment are discussed below.

C. Defamation Counterclaim

In Count IV of his Amended Counterclaims, Buchko asserts a defamation claim in which he alleges that Robert Lewis, Brandon Otis and other Orbital employees made disparaging and false statements about his job performance. He also asserts that a document circulated to various individuals in Orbital included defamatory information. Further, Buchko contends that Robert Lewis and other top-level Orbital executives falsely spoke about his termination with Orbital customers. The parties dispute various facts related to this claim.

In support of its motion for summary judgment on this claim, Orbital notes that Robert Lewis, Chief Financial Officer Brandon Otis ("Otis") and Buchko's replacement as COO, Arno Wainikainen ("Wainikainen"), all testified in their depositions that they made no defamatory comments about him. (PCSMF ¶¶ 19-21.) According to Buchko, Orbital's own evidence shows that executives were directed to use a document called the "talking points memo" when discussing

5

the reason for Buchko's termination with employees and customers and that, as detailed below, this document contained material capable of a defamatory meaning. (DRPCSMF ¶¶ 19-21.)

Orbital also argues that there is no other evidence that any Orbital employee made any defamatory statements about Buchko. Orbital also asserts that Buchko has failed to provide evidence of any damages or specific job opportunities he lost as a result of any purportedly defamatory statements made by Orbital. (PCSMF ¶ 24.)

Buchko argues that Orbital has ignored relevant and disputed facts of record and that the factual basis for his claim is far broader than Orbital suggests. He asserts that his claim is based on false and defamatory communications made by Orbital both to its employees and customers about the reasons for his termination, including those matters discussed in a document described in this action as the "talking points memo." (DRPCSMF ¶ 15; ECF No. 224 Ex. EEE.)

The talking points memo was prepared sometime in January 2020 after the decision was made to terminate Buchko. (ECF No. 224 Ex. HHH.) According to Orbital, this memo was prepared by Dylan Lewis to guide certain employees in fielding questions about Buchko's termination on an as-needed basis and that neither it nor its contents were disseminated. (Plaintiff's Response to Defendant's Counterstatement of Material Facts ("PRDCMF") ¶¶ 80-81) (ECF No. 245). As this Court noted in its February 22, 2021 Order, however, Otis testified that he "contributed to the document" and that it was either created by him or Dylan Lewis but was a 'collaborative effort.'" (ECF No. 107 at 2; see ECF No. 84 Ex. A at 67-68.) Its stated purpose "is to summarize the key reasons for [Buchko's] departure and to provide talking points for discussions with GMs [general managers] and individual offices." (DRPCSMF ¶¶ 72-73.)

The parties dispute how widely this memo, rather than some of its content, was circulated. It is uncontroverted that the talking points memo was distributed to Wainikainen, Thomas Evans,

the Chief Technical Officer and head of an Orbital subsidiary, Orbital Technical Solutions ("OTS"), and Stephen Kleinen, the Director of Strategic Partnerships. (DCSMF ¶ 79; PRDCSMF ¶ 79.) These individuals are identified by Orbital as the both the "senior leadership team" and a "small transition team." (PRDCSMF ¶ 79.)  Otis sent an email on January 21, 2020 to Robert Lewis, Dylan Lewis, Kleinen and Evans that states, in part, that "attached are talking points for GMs and other personnel, as needed." (DRPCSMF ¶¶ 79-80; ECF No. 224 Ex. HHH.)  Otis also explained in his email that the talking points should be used when speaking to "all offices" within Orbital and "we need to be cognizant of delivering only the necessary points when we talk with teams on March 2 and 3." (*Id.* ¶¶ 80-81; Ex. HHH.)

While the talking points memo states that it was to be used for communicating to third parties why Buchko was terminated, Orbital does not discuss or appear to rely on some of the referenced "key reasons" for Buchko's departure as the basis for his termination or as representative of "willful misconduct." For example, Orbital has not claimed that Buchko was terminated because of any violation of Orbital's drug and alcohol policy although the memo discusses related issues. (DRPCSMF ¶ 74-76). Nor has it suggested that he was fired for "[s]pread[ing] false information about leaders, including Thomas Evans." (*Id.* ¶¶ 77-78.) The talking points memo cites many other "key reasons" for Buchko's departure under headings of "insubordination," "negligence," "undermining other leaders" and "other," including allowing employees to charge time when they weren't working, undermining various company matters and decisions, wasting resources and using Robert Lewis's personal funds for office renovations.

Buchko claims that Orbital management eventually disseminated information contained within the talking points memo to, at minimum, these individuals: Brian Bub, Brian Gray, Fred Ogden, Andrew Purser, Guy York and Mr. Harting, who were the GMs from the Pittsburgh,

Philadelphia, Detroit, Hammond, St. Louis, and Texas offices; a select group of Hammond employees; the entire IT department; Scott Sambuco in Pittsburgh; and the entire sales team within Orbital. The Regional Manager of Asset Integrity, Bryan Gehrling, emailed members in his group stating, "Guys – I got some more information on the departure of Jeff…Overall for the company it seems to be an appropriate decision after the details I've heard . . ." (DRPCSMF ¶¶ 82-83, 106.)

Otis and Wainikainen testified that they did not share the talking points memo or its contents but only communicated with the referenced individuals about Buchko's termination as a general matter, citing his disagreements with Robert Lewis, Buchko's alleged insubordination and the fact that there had been an IT interruption while Buchko was in charge. (PRDCSMF ¶¶ 81-83.) Orbital suffered a ransomware attack on November 19, 2019 and contends that Buchko, whose areas of oversight included the IT department, failed to ensure that the Company had adequate cybersecurity, which left the Company vulnerable to this attack. (DRPCSMF ¶ 96.) Orbital cites this incident as one of the examples of Buchko's "willful misconduct."

Buchko asserts that his defamation claim relates in part to Orbital's accusations of business misconduct. This misconduct includes but is not limited to the following statement in the talking points memo:

> [Buchko] [r]efused to [his] wipe computer, allowing another network intrusion, and then pushed back on shipping his computer back for isolation. This, in particular, put the entire company at significant risk of another intrusion, with no underlying justification.

(DRPCSMF ¶ 84.) Further, under the heading of "Talking Points for GMs," Orbital states that Buchko "refused to wipe his computer, allowing recurrence of the virus, then pushed back on shipping his computer to isolate the virus. This was particularly egregious because he put the entire company at risk." (*Id.* ¶ 85.) This incident occurred after the decision to terminate Buchko's employment had been made.

Joe Grelewicz, the Regional Manager with OTS in Hammond, Indiana, met privately with Otis after hearing that Buchko had been terminated. He testified that Otis told him that:

- Buchko was unwilling to turn in his computer for scrubbing and that such conduct could compromise Orbital's entire network.

- Buchko was placing the entire company at risk should he have plugged his computer into the network.

(DRPCSMF ¶¶ 87; Ex. DDD ¶ 14-15.) Grelewicz states that he was also told by Otis, among other things, that Buchko failed to do the things as COO to prevent a cyberattack from occurring. (*Id.* ¶ 16.) Buchko notes the similarity between these statements to Grelewicz and the cited portions of the talking points memo.

Buchko asserts that these allegations of business misconduct are untrue, because after Dylan Lewis demanded that he send his work-issued laptop computer to a third-party vendor, coupled with a threat of immediate termination, he promptly complied and sent his computer overnight to the address provided. Thereafter, his computer was redirected to Pittsburgh for forensic analysis by a third party, which accessed the files and concluded that only proper work activity was found on his computer. (DRPCSMF ¶¶ 89-91.) Orbital describes these events slightly differently (PRDCSMF ¶¶ 89-91), but characterizes them as immaterial.

In addition to business misconduct, Buchko's defamation claim is also based on what he characterizes as accusations of financial fraud, or criminal conduct, in the talking points memo. This includes allegations of using specific bank accounts without authorization, moving jobs from OTS to Orbital to minimize OTS's financial performance, and moving proposals and jobs out of OTS to reduce OTS's revenues. According to Grelewicz, Otis told him that Buchko had engaged

in questionable accounting practices (DRPCSMF ¶¶ 95-96.)[3]

Buchko contends that Robert Lewis and other top-level Orbital executives spoke about his termination with Orbital customers, including Union Pacific, U.S. Steel, FirstEnergy, Monroe Energy, Showcor and Ernst & Young and were directed to use and reference the talking points memo, which accuses Buchko of serious business and criminal misconduct. (DRPCSMF ¶ 105.) Buchko testified that one of his former customer contacts and a former Orbital employee told him that Robert Lewis contacted them and told them that "he had to terminate Buchko for cause, and that, you know, Buchko negatively impacted the company, but I don't think that he delved far into any details." (PCSMF ¶ 29.) Orbital claims that Buchko's deposition testimony establishes that two Orbital customers who heard allegedly defamatory statements by Robert Lewis in no way lowed their view of Buchko as a result. But this is disputed by Buchko and not supported by the record. (*Compare* PCSMF ¶ 18 *with* DRPCSMF ¶ 18).

Buchko asserts that Orbital's actions have caused him to lose employment opportunities with multiple companies (as explained herein). (DRPCSMF ¶ 24.)

D. <u>Counterclaim for Tortious Interference</u>

In part, Buchko's tortious interference claim is based on Orbital's conduct in filing a Complaint that lists all twenty-three examples of "willful misconduct" even though Orbital does not contend that Buchko engaged in most of the stated examples. He also contends that Orbital's actions have impeded or curtailed employment opportunities with J.R. Johnson Engineering, Inc.

---

before Orbital contends that "the Grelewicz declaration has no evidentiary value insofar as it contains statements not based on the witness' [sic] first-hand perception of statements actually made by an Orbital representative." (PRDCSMF ¶¶ 95-96.) Certainly, his declaration includes both his statements about what Otis said to him, which does have evidentiary value, as well as his conclusions about what Otis was implying, which may not be admissible evidence. However, Orbital has not refuted Buchko's point that Grelewicz appears to be aware of information in the talking points memo.

("JRJE"), the Federal Emergency Management Agency ("FEMA"), Valdes Engineering ("Valdes") and ECS Limited ("ECS"). (DRPCSMF ¶ 24.)

As it relates to JRJE, after Buchko and JRJE negotiated an employment arrangement and he made the disclosure to Orbital required by the NCA (ECF No. 224 Ex. A ¶ 5.), Orbital directed a letter to JRJE in which it demanded that JRJE terminate Buchko's employment because it would violate the terms of the NCA. (DRPCSMF ¶¶ 97-101.) This letter does not mention Buchko's having been terminated for willful misconduct. Orbital contends that Buchko admitted that JRJE delayed his employment not because of this letter, but because Orbital filed a motion for preliminary injunction. (PRDCSMF ¶ 101.) However, while Buchko was asked if he spoke to someone at JRJE "once the injunction was filed," he did not testify that JRJE delayed his employment *because* the motion had been filed. (Buchko Dep. ECF No. 241 Ex. 17 at 124:13.) Moreover, the injunction motion was filed on June 4, 2021 (ECF No. 110) and Orbital sent its letter to JRJE on June 8, 2021 (ECF No. 224 Ex. Q). Thus, it cannot be determined based on this record when JRJE decided to delay hiring Buchko or the reason or reasons why it chose to do so.

FEMA also extended Buchko a conditional offer of employment. However, FEMA learned that Buchko had been terminated for willful misconduct when Buchko conveyed this information to the agency. On October 16, 2020, FEMA sent Buchko a letter advising him that the agency had found him unfit for assignment as a contractor employee based on information developed during pre-appointment security checks. Specifically:

> [Y]ou reported being terminated from your employer in March 2020 due to allegations of misconduct. A Letter of Interrogatory (LOI) was sent to you on September 21, 2020 identifying the issue and requesting information/explanation regarding the findings. We received your responses; however, they did not sufficiently mitigate the issues, which has resulted in the determination referenced above. This decision is final, and there is no appeal process.

(DRPCSMF ¶ 104.) FEMA rescinded its offer to Buchko. (*Id.* ¶¶ 102-04.)

As for ECS, Buchko testified that he was at the final stages of discussing the details of coming on board, but "subsequently, it was when they asked [for] more details around the April 6th letter that it had to convey to them and . . . the offer never showed up." (Buchko Dep. 317:19-22 (ECF No. 169 Ex. 3).) *See also id.* at 318:20-23 ("We made it to the point where I was anticipating an offer to show up. The last hurdle of that was to convey what Orbital was alleging. I provided that, and the offer did not show up.")

Valdes also issued and later rescinded an offer of employment to Buchko. After Buchko filed a motion for preliminary injunction against Orbital (ECF No. 7), and Orbital, with the Court's permission (ECF No. 19), served a subpoena on Valdes in which it sought information relating to its proposed employment relationship with Buchko, Valdes withdrew its offer. Buchko alleges in his Amended Counterclaims that: "The conduct of Orbital in pursuing this claim in federal court, and in its persistent assertion that Mr. Buchko engaged in 'willful misconduct' caused Valdes to withdraw its offer of employment." (ECF No. 36 ¶ 57.) There is no direct evidence of record about why Valdes made this decision.

Finally, as discussed above, Buchko contends that Robert Lewis and other top-level Orbital executives spoke about his termination with Orbital customers, including Union Pacific, U.S. Steel, FirstEnergy, Monroe Energy, Showcor and Ernst & Young. There is no direct evidence in the record that any prospective employer declined to offer employment or rescinded an offer of employment based on comments by Robert Lewis or other Orbital executives. (PRDCSMF ¶ 105.)

E. Bonus Counterclaim

The NCA states, in relevant part, that among the benefits to which Buchko was entitled upon signing the agreement is "eligibility to participate in Orbital's bonus plan "as defined and promulgated by the Company's CFO." (ECF No. 224 Ex. A at 1.)

The parties dispute the facts associated with Buchko's bonus. According to Otis, Orbital's CFO, he defined and promulgated a bonus plan that applied to general managers. This plan was in writing. (PCSMF ¶¶ 36-37.) He also created a bonus plan for Buchko that was based on 4% of the growth in gross margin of all offices except Hammond, Indiana; a discretionary bonus of up to $10,000 if Orbital reached $50 million in sales; and a discretionary bonus of up to $10,000 for achievement of soft goals. The only document that sets forth this calculation is an internal memo created by Otis in connection with the negotiations that lead to the NCA. (PCSMF ¶¶ 36-37; ECF No. 224 Ex. FFF.) This plan was used to calculate the bonus Buchko received for fiscal year ended March 31, 2019. (*Id.*) His bonus was calculated on April 30, 2019 and paid on May 3, 2019. (PCSMF ¶ 41.)

Orbital contends that Buchko was not eligible for a bonus because he was terminated on March 2, 2020, which was before the end of the fiscal year and before bonuses were calculated and paid. (PCSMF ¶¶ 34-44; PRDCSMF ¶¶ 107-21.) Otis asserts in his declaration that to be eligible for a bonus, an employee must be employed by Orbital when bonuses are calculated. (PCSMF ¶ 40.) There is no contemporaneous writing to this effect.

Buchko asserts that he would be entitled to a bonus because he increased the contribution margin at nearly every office location. (DRPCSMF ¶¶ 34-44.)

F.   Unused Vacation Time Counterclaim

The NCA makes no reference Buchko's entitlement to vacation pay upon termination, although Buchko's vacation time was increased from three to four weeks upon his execution of the document. The 2016 Employee Handbook, which was in effect when the NCA was signed and is referenced in the NCA about the issue of willful misconduct, indicates that unused vacation time is payable. In contrast, the 2019 Employee Handbook states that unused vacation time is not

payable. (PCSMF ¶¶ 49-52.)

## III.   Discussion

### A.   Standard of Review

Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment shall be granted if there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). Summary judgment may be granted against a party who fails to adduce facts sufficient to establish the existence of any element essential to that party's case, and for which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party bears the initial burden of identifying evidence which demonstrates the lack of a genuine issue of material fact. Once that burden has been met, the non-moving party must set forth "specific facts showing that there is a genuine issue for trial" or the factual record will be taken as presented by the moving party and judgment will be entered as a matter of law. *Matsushita Elec. Indus. Corp. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). An issue is genuine only if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The Court of Appeals has held that "where the movant bears the burden of proof at trial and the motion does not establish the absence of a genuine factual issue, the district court should deny summary judgment even if no opposing evidentiary matter is presented." *Nat'l State Bank v. Federal Rsrv. Bank,* 979 F.2d 1579, 1582 (3d Cir. 1992).

In following this directive, a court must take the facts in the light most favorable to the non-moving party, and must draw all reasonable inferences and resolve all doubts in that party's favor. *Hugh v. Butler County Fam. YMCA*, 418 F.3d 265, 266 (3d Cir. 2005); *Doe v. County of Centre, Pa.*, 242 F.3d 437, 446 (3d Cir. 2001).

B.  Judicial Privilege

Orbital asserts that it is entitled to judgment in its favor on Buchko's claim of tortious interference and his request for a declaratory judgment because its actions are protected by an absolute judicial privilege. It contends that both claims are based solely on statements made during this litigation and/or preceding the filing of the case.[4]

The Federal Rules of Evidence provide that federal common law governs a claim of privilege other than in civil cases, where state law governs privilege on a claim or defense for which state law supplies the rule of decision. *See* Fed. R. Evid. 501. Buchko's counterclaims arise under Pennsylvania law and therefore Pennsylvania law regarding judicial privilege applies. *See Jacovetti L., P.C. v. Shelton*, 2020 WL 1984883, at *2 (E.D. Pa. Apr. 27, 2020).

Under Pennsylvania law, communications pertinent to any stage of a judicial proceeding are generally accorded an absolute privilege. *See Binder v. Triangle Pubs., Inc.*, 275 A.2d 53, 56 (Pa. 1971). These can include a complaint or other pleadings filed in court. *Gen. Refractories Co. v. Fireman's Fund Ins. Co.*, 337 F.3d 297, 312 (3d Cir. 2003). The privilege exists "because there is a realm of communication essential to the exploration of legal claims that would be hindered were there not the protection afforded by the privilege." *Id.* at 311 (citations and internal marks omitted). "Therefore, the privilege (1) only applies to communications, and (2) does not apply to communications not either 'pertinent and material to the redress or relief sought,' or 'essential to the exploration of legal claims in litigation.'" *Id.* at 311-12 (quoting *Post v. Mendel*, 507 A.2d 351, 353 (Pa. 1986); *Silver v. Mendel*, 894 F.2d 598, 603 (3d Cir. 1990)). *See Todi v. Stursberg*, 2001

---

[4] Orbital asserts that if Buchko bases any part of his defamation claim on Orbital's statements in this lawsuit, any such claim would also be barred. (ECF No. 168 at 6 n.5.) Based on a review of Buchko's Amended Counterclaims and his memorandum opposing summary judgment on his defamation claim, the Court finds that Buchko's defamation claim is not based on statements made at any stage of this lawsuit.

WL 1557517, at *1 (E.D. Pa. Dec. 4, 2001) (dismissing various counterclaims because they depended solely on statements in the Complaint and thus were barred by the doctrine of absolute judicial privilege).

As the Court of Appeals noted in *General Refractories*, "the key to the absolute privilege accorded an attorney in the representation of a client in judicial proceedings . . . is whether the pertinent communication was undertaken in connection with representation of a client in a judicial proceeding." *Id.* at 312 (citations omitted).[5]

This privilege extends to an attorney's conduct in advocating for a client under less formal circumstances. *Smith v. Griffiths*, 476 A.2d 22, 25 (Pa. Super. 1984). The extent of a lawyer's privilege has been defined in the Restatement (Second) of Torts § 586 as follows: "An attorney at law is absolutely privileged to publish defamatory matter concerning another in communications preliminary to a proposed judicial proceeding, or in the institution of, or during the course and as a part of, a judicial proceeding in which he participates as counsel, if it has some relation to the proceeding."

For a lawyer's communication to be entitled to immunity, the communication must be pertinent and material to the redress sought in a suit and issued in the regular course of the proceedings, or pertinent and material to a suit and was required to be issued in the regular course of preparing for contemplated proceedings. *See Post*, 507 A.2d at 356. To permit an attorney to best serve a client, the privilege must also be broad enough to include occasions when a client's

---

[5] Buchko argues that "extra-judicial communications which are not subject to the internal controls of the court system, and do not require the same degree of protection as those communications which are essential to the integrity and independence of the judicial system. As such, they enjoy a qualified immunity only." *Pelagatti v. Cohen*, 536 A.2d 1337, 1344 (Pa. Super. 1987), *appeal denied*, 548 A.2d 256 (Pa. 1988). But the court was referring to "newspaper accounts of judicial proceedings, or to remarks uttered at press conferences," neither of which describes any statements made in this case.

cause is being advocated under less formal circumstances as well. *Smith*, 476 A.2d at 25. "Importantly, the existence of the privilege does not depend upon the motive of the defendant in making the allegedly defamatory statement." *Richmond v. McHale*, 35 A.3d 779, 784 (Pa. Super. 2012). *See also Miketic v. Baron*, 675 A.2d 324, 327 (Pa. Super. 1996) ("One who publishes defamatory matter within the scope of an absolute privilege is immune from liability regardless of occasion or motive.") (citation omitted).

Whether a particular statement is entitled to an absolute privilege is a question of law for the court. *Smith v. Griffiths,* 476 A.2d 22, 25 (Pa. Super. 1984). "Where the question of the relevancy and pertinency of matters communicated is to be inquired into, all reasonable doubt must be resolved in favor of relevancy and pertinency." *Id.*

While it is less than clear, there appear to be three statements at issue with respect to Orbital's claim of judicial privilege: the Complaint filed by Orbital; the letter sent by counsel for Orbital to Buchko's counsel on April 6, 2020;[6] and the letter sent by Orbital's counsel to JRJE on June 8, 2021. Orbital contends that all of these statements are protected by judicial privilege, while Buchko asserts that these statements are not protected by judicial privilege either because they are not relevant and pertinent to this litigation or were published to non-parties to the litigation.

As for Orbital's Complaint, Buchko suggests that because it cites all twenty-three examples of willful misconduct listed in the Employee Handbook, Orbital effectively accused him of having engaged in all of the listed conduct although most of the examples are not relevant to Orbital's

---

[6] Buchko does not specifically address the April 6th letter in his brief. But at his deposition, Buchko testified that he believed that FEMA was prepared to offer him a position until he provided the April 6th letter to the agency at its request. (ECF No. 169 Ex. 3 at 306:21-307:5.) Buchko also argues that Orbital has failed to specify the statements in these proceedings it is seeking to bar based on judicial privilege. (ECF No. 222 at 13 n.4.) However, Orbital has discussed the Complaint and the April 6th letter and Buchko has cited the June 8th letter to JRJE.

claims of alleged misconduct. Thus, Buchko argues, these allegations are not "pertinent and material to the relief sought."

A plain reading of the Complaint shows that it does not accuse Buchko of all the examples provided. The Complaint alleges that Buckko was terminated for willful misconduct and quotes verbatim the definition of willful misconduct from the Employee Handbook. (Compl. ¶¶ 14-15.) Orbital did not identify any specific conduct in which Buchko is alleged to have engaged, but the Complaint does not allege that Buchko engaged in all twenty-three examples. Thus, the Complaint does not say, nor does the Court find that it is reasonable to conclude, that Orbital alleged that Buchko engaged in all twenty-three examples of willful misconduct.

Buchko's reliance on the *Silver* case is misplaced. In that case, the Court of Appeals held that the filing of an involuntary bankruptcy petition with no belief in its merits and for a purpose other than to seek redress from the court was not a communication in the regular course of judicial proceedings or patient to the relief sought. 894 F.2d at 603. By contrast, there is no basis to conclude that the Complaint was filed "without having probable cause to believe in the merit of the [it] and for a purpose other than the securing of redress from the court."[7]

Orbital's Complaint seeks redress of its claim that Buchko breached the NCA as well as a declaration that Buchko is bound under the NCA because of its claim that he engaged in willful misconduct. If the Complaint had accused Buchko of having engaged in some behavior which Orbital knew he had not committed, then Buchko could contend that these statements were not "issued in the regular course of judicial proceedings," "pertinent and material to the . . . relief sought," or "essential to the exploration of claims" in litigation. That is not the case here, however.

---

[7] Buchko did not file a Rule 11 motion that the complaint was filed for an improper purpose. This does not suggest, however, that Buchko is foreclosed from questioning Orbital at trial about the specific reasons it terminated him or the timing of the formulation of these reasons.

Simply put, all reasonable doubt must be resolved in favor of relevancy and pertinency. Thus, the Complaint filed by Orbital in this case is absolutely privileged and cannot be a basis for any of Buchko's counterclaims.

The same analysis applies to Orbital's April 6, 2020 letter to Buchko's counsel. In that letter, which responded to a communication from Buchko's counsel denying any improper conduct, Orbital cited fifteen instances of allegedly improper conduct. Clearly, the parties were in engaged in a dispute preparatory to litigation, which quickly ensued afterward. Moreover, because the letter was not published to anyone other than Buchko and his counsel, it could not support a defamation or tortious interference claim. *See Yetter v. Ward Trucking Corp.*, 585 A.2d 1022, 1024 (Pa. Super. 1991), *appeal denied*, 600 A.2d 539 (Pa. 1991) (letter articulating the reasons for an employee's termination published only to the employee "may not be made the subject of an action in libel, regardless of whether the allegations of cause are true or false and regardless of the actual motive behind the dismissal.") (citation omitted). *See also Frank v. Allstate Ins. Co.*, 32 F. Supp. 3d 569, 572 (E.D. Pa. 2014) (following *Yetter*, court rejected theory of "compelled self-publication" which would allow for liability of former employer who provided reason for termination to employee who in turn had to repeat this information to prospective employers). Thus, the judicial privilege applies to the April 6, 2020 letter as well.

The third and final communication for which Orbital asserts a judicial privilege is its counsel's June 8, 2021 letter to JRJE. This letter demanded that JRJE terminate its employment relationship with Buchko because it would violate the terms of the NCA. The letter does not mention Buchko's having been terminated for willful misconduct. Buchko proffers this letter in support of his claim that Orbital tortiously interfered with his agreement with JRJE by demanding that it terminate an employment relationship with him, leading to the delay of his employment.

Orbital had already started injunction proceedings to enjoin Buchko from taking a position with JRJE four days before it sent this letter. It later withdrew its motion and filed suit against JRJE in the Northern District of Ohio. Notably, in opposing Buchko's subsequent motion for sanctions based on this conduct, Orbital contended that these lawsuits were unrelated to one another because its Complaint against Buchko was filed a year before he began his employment discussions with JRJE and JRJE is not a party to this case. (ECF No. 199 at 22-24.)

Buchko argues that the letter to JRJE is not material and pertinent to *this proceeding*. Orbital contends otherwise, citing *Bennett v. Itochu International, Inc.*, 682 F. Supp. 2d 469, 476 (E.D. Pa. 2010). In *Bennett*, the court held that a letter sent during litigation was privileged, in part because "the letter was sent only to a group of people who were intimately involved with the lawsuit, which is further proof of the legal nature of the communication." *Id.* at 477.

Orbital sought an injunction against relief against Buchko related to his prospective employment with JRJE. Despite having a forum to restrict Buchko from employment and exercising its right to do so, Orbital then took the step of demanding that JRJE, a third party, terminate Buchko and then suing JRJE in Ohio. By contending that its separate lawsuits against Buchko and JRJE are unrelated to one another, Orbital appears to have conceded that JRJE is not "intimately involved" with this lawsuit and thus its communication was not made in connection with this judicial proceeding. Therefore, Orbital cannot now contend that JRJE is so "intimately involved" in this case that Orbital has absolute immunity with respect to its June 8, 2021 letter to JRJE.

Orbital also argues that Buchko's request for a declaratory judgment is barred by judicial privilege because it relates to actions taken in preparation for and during this lawsuit. "The form of the cause of action is not relevant to application of the privilege. Regardless of the tort contained

in the complaint, if the communication was made in connection with a judicial proceeding and was material and relevant to it, the privilege applies." *Gatter v. Zappile*, 54 F. Supp. 2d 454, 457 (E.D. Pa. 1999) (citing *Clodgo by Clodgo v. Bowman*, 601 A.2d 342, 345 (Pa. Super. 1992)), *aff'd mem.*, 225 F.3d 648 (3d Cir. 2000).

However, Buchko's declaratory judgment claim is primarily based on the enforceability of the NCA, not actions taken by Orbital before or during the litigation of this case. His claim for declaratory relief seeks: a determination voiding the restrictive covenants, which he asserts would allow him to move forward with prospective employers; a determination that he did not engage in willful misconduct; and an order enjoining Orbital from further interference with his employment search efforts. (See, e.g., ECF No. 36 ¶¶ 77-78.) As it relates to the latter, Buchko is not barred from seeking to enjoin future actions by Orbital that he alleges are not subject to a judicial privilege because they are not relevant and pertinent to this action. Thus, his declaratory judgment counterclaim is not barred by judicial privilege.

C.  Tortious Interference

Buchko's tortious interference with contractual relations claim relates to Orbital's interference with his ability to obtain employment because of its allegations of willful misconduct; its executives' interference with his prospective employment; and its interference with his employment relationship with JRJE.

Under Pennsylvania law, the elements of a cause of action for intentional interference with a contractual relation, whether existing or prospective, are:

> (1) the existence of a contractual, or prospective contractual relation between the complainant and a third party; (2) purposeful action on the part of the defendant, specifically intended to harm the existing relation, or to prevent a prospective relation from occurring; (3) the absence of privilege or justification on the part of the defendant; and (4) the occasioning of actual legal damage as a result of the defendant's conduct.

*Crivelli v. General Motors Corp.*, 215 F.3d 386, 394 (3d Cir. 2000) (citation omitted). A plaintiff must prove that "the defendant's actions were improper under the circumstances presented." *Walnut St. Assocs., Inc. v. Brokerage Concepts, Inc.*, 982 A.2d 94, 98 (Pa. Super. 2009).

In moving for judgment in its favor on this claim, Orbital first argues that allegations in the Complaint are protected by judicial privilege. As earlier discussed, the Court agrees that these statements are privileged and thus cannot support Buchko's intentional interference with prospective relations claim.

Buchko contends that Robert Lewis and other top-level Orbital executives spoke with various Orbital customers about his termination. He claims that Orbital employees were directed to use and reference the talking points memo, which accuses Buchko of serious misconduct. (DRPCSMF ¶ 105.) However, the testimony on which Buchko relies reveals that Orbital executives other than Robert Lewis notified customers nothing more than that Buchko had been terminated. (PRDCSMF ¶ 105.)

As for the statements of Robert Lewis, Buchko testified only that he heard from one of his customer contacts and a former Orbital employee that Robert Lewis contacted them and told them that "he had to terminate [Buchko] for cause, and that, you know, [Buchko] negatively impacted the company, but I don't think that he delved far into any details." (PCSMF ¶ 29.) Orbital contends that, even if true, there is no record evidence that would permit a jury to find that Robert Lewis's statements prevented Buchko from obtaining any employment.

Buchko has elicited no evidence that any of Orbital's customers declined to interview or hire him or withdrew offers of employment made to him, much less that they did so based on communications from Orbital. Even viewing these facts in the light most favorable to Buchko, with no evidence from any of these customers, there is simply no basis to conclude that Orbital

intentionally interfered with any prospective or existing relationships that Buchko may have had. Without objective evidence, Buchko's assertions are mere speculation. Therefore, Orbital is entitled to judgment in its favor on Buchko's claim of tortious interference to the extent that it is based on communications made by Orbital executives to these companies.

Buchko also provides examples of companies which declined to hire him, including Valdes, FEMA and ECS. Valdes issued and later rescinded an offer of employment to Buchko after it was served with a subpoena by Orbital in this litigation. Buchko cites no evidence to the effect that any action by Orbital, other than in the context of this lawsuit, caused or contributed to Valdes' withdrawal of employment. Thus, as Orbital's conduct during this litigation is protected by the judicial privilege and there is no evidence of any purposeful action on the part of Orbital that was specifically intended to harm an existing relationship, or to prevent a prospective relationship from occurring, Buchko's intentional interference claim as it relates to Valdes fails as a matter of law.

Buchko also points to FEMA's rescission of its employment offer to him. However, FEMA's decision resulted from information it received from Buchko, not from Orbital, about this litigation. Moreover, even if FEMA reviewed the Complaint filed in this case, Orbital's conduct is protected by judicial privilege as explained above. Thus, Buchko has not supported a tortious interference claim for the lost opportunity at FEMA.

As for ECS, Buchko testified that he was at the final stages of discussing the details of coming on board, but "subsequently, it was when they asked [for] more details around the April 6th letter that it had to convey to them and . . . the offer never showed up." (Buchko Dep. 317:19-22 (ECF No. 169 Ex. 3).) Thus, ECS's decision appears to be based on information it received from Buchko, not from Orbital. Buchko offers no evidence that conduct by Orbital, other than asserting a claim

against Buchko and commencing a lawsuit, interfered with his prospective relationship with ECS. As previously addressed, Orbital's representations in preparing for and commencing this lawsuit are protected by judicial privilege.

The same cannot be said about JRJE, however. After Buchko had been offered employment by JRJE, he provided Orbital with the required notice. Orbital then moved for an injunction against Buchko related to this employment. Having commenced this proceeding, which, if successful, would have preliminarily foreclosed Buchko's employment with JRJE, Orbital nonetheless then directed a letter to JRJE demanding that it terminate Buchko's employment without waiting for the injunction motion to be resolved. As of the date of this opinion, Buchko is not employed by JRJE.

Thus, viewing these facts in the light most favorable to Buchko, there are genuine issues of material fact related to whether Orbital intentionally interfered with this prospective relationship that preclude summary judgment in Orbital's favor regarding its conduct vis-à-vis JRJE. As a result, Orbital's motion for summary judgment on Buchko's tortious interference claim as it relates to JRJE will be denied.

D.  Defamation Claim

Orbital contends that Buchko's defamation claim fails because he has not cited specific statements that defamed him and has not shown that he suffered special harm as a result.

Defamation claims asserted under Pennsylvania law are governed by statute:

> (a) Burden of plaintiff. In an action for defamation, the plaintiff has the burden of proving, when the issue is properly raised:
>
> > (1) The defamatory character of the communication.
> >
> > (2) Its publication by the defendant.
> >
> > (3) Its application to the plaintiff.

(4) The understanding by the recipient of its defamatory meaning.

(5) The understanding by the recipient of it as intended to be applied to the plaintiff.

(6) Special harm resulting to the plaintiff from its publication.

(7) Abuse of a conditionally privileged occasion.

42 Pa. C.S. § 8343(a). The defendant bears the burden of proving the following affirmative defenses: (1) the truth of the defamatory communication; (2) the privileged character of the occasion on which it was published; and (3) the character of the subject matter of defamatory comment as of public concern. 42 Pa. C.S. § 8343(b). If a defendant carries its burden to show that a communication is conditionally privileged, the burden shifts to the plaintiff to establish that the defendant abused its conditional privilege. *Miketic*, 675 A.2d at 329.

"Under Pennsylvania law, the court must decide at the outset whether a statement is capable of defamatory meaning. If the court determines that the statement is capable of defamatory meaning, the jury must then decide whether the recipient actually understood the statement to be defamatory." *Tucker v. Fischbein,* 237 F.3d 275, 281-82 (3d Cir. 2001) (citations omitted). Moreover, "if there is an innocent interpretation and an alternate defamatory interpretation, the issue must proceed to the jury." *Rush v. Philadelphia Newspapers, Inc.,* 732, A.2d 648, 652 (Pa. Super. 1999) (citation omitted).

Orbital contends that Buchko's counterclaim only vaguely alleges that Robert Lewis and Otis made certain "defamatory statements" to Orbital employees after he was terminated and that, at his deposition, Buchko could not point to specific statements constituting defamation. It correctly notes that comments critical of an employee's job performance are not defamatory. *See Baker v. Lafayette Coll.*, 532 A.2d 399, 402 (Pa. 1987). *See also Wendler v. DePaul*, 499 A.2d

25

1101, 1103 (Pa. Super. 1985) ("While appellant's job performance was criticized, he was not accused of dishonesty or anything else that would 'blacken [his] reputation or [ ] expose him to public hatred, contempt, or ridicule.'")

However, the statements on which Buchko relies, at least in part, are those made in the talking points memo, which was not produced until February 22, 2021, after the close of discovery.[8] Having reviewed it, the Court finds that information in the talking points memo *is* capable of a defamatory meaning. Orbital accused Buchko of business misconduct for any number of issues, including wasting resources, allowing employees to charge time when they weren't working, undermining company decisions, alcohol issues, spreading false information and putting the Company at risk of another cyberattack. *See Walker v. Grand Cent. Sanitation, Inc.*, 634 A.2d 237, 241 (Pa. Super. 1993) ("It is beyond any reasonable cavil that a publication in which the speaker imputes to another conduct, characteristics, or a condition that would adversely affect her in her lawful business or trade is termed a 'slander per se.'") It could not reasonably be argued that these allegations were merely criticism of Buchko's performance as an Orbital employee.

Orbital accused Buchko of arguably fraudulent conduct when it stated that he used specific bank accounts without permission, moved jobs from OTS to Orbital to minimize OTS's financial performance and moved proposals and jobs out of OTS to reduce OTS's revenues. As another court has noted, "an accusation of criminality exists although the defamer does not 'charge any particular criminal offense either by name or description, if the words use imply some crime.'" *Clemente v. Espinosa*, 749 F. Supp. 672, 679-80 (E.D. Pa. 1990) (quoting Restatement (Second) of Torts § 571, comment c (1977)).

---

[8] Thus, if Orbital attempts to rely on Buchko's inability to explicitly identify defamatory statements during his deposition, it is uncontroverted that he had not seen the talking points memo until after his deposition.

In addition, the Grelewicz declaration states that he was told by Otis that Buchko was unwilling to turn in his computer for scrubbing, which was represented to be conduct that could compromise Orbital's entire network and placing the entire company at risk. He was also told that Buchko had failed to prevent a cyberattack, had engaged in questionable accounting practices and was interfering with a separate business entity in a way that was harmful to Orbital

Bucko asserts in his Amended Counterclaims that Robert Lewis defamed him through communications, among others, with Orbital's customers. As noted in Orbital's concise statement of facts, Buchko testified during his deposition that he heard from a customer contact and a former employee that Robert Lewis had contacted them and told them that he had to terminate Buchko for cause and that he negatively impacted the company. (PCSMF ¶ 29.)[9] Stating that Buchko's conduct negatively impacted Orbital can be construed as more than mere criticism of his work or comments on poor performance, and could adversely affect his business prospects.

 The Court finds that at least some portions of the talking points memo, the statements made by Otis to Grelewicz and Robert Lewis's statements to are capable of defamatory meaning. Thus, the first and third elements of a defamation claim are sufficiently satisfied for purposes of summary judgment.

As for the issue of publication, Orbital argues that the talking points memo was distributed by Otis and/or Dylan Lewis only to several other Orbital executives because they "needed to know" the information in answering questions about Buchko's departure from the Company. Given Orbital's position that there are a discrete and limited number of "examples" from the Employee

---

[9] While these statements are hearsay, they can be considered in connection with a summary judgment motion if they are capable of admission at trial. *Shelton v. Univ. of Med. & Dentistry of N.J.*, 223 F.3d 220, 223 n.2 (3d Cir. 2000). If Buchko intends to introduce this evidence at trial, he must call these witnesses and lay a sufficient foundation to do so.

Handbook that formed the basis for its decision to terminate Buchko, it is curious, to say the least, that executives who were not involved in this decision needed to know detailed and explicit information that goes well beyond Orbital's stated reasons. At any rate, Buchko contends that the memo—or at least information in it—was distributed beyond these executives, a fact that Orbital disputes.

Moreover, while the privileged character of publication is a defense to a defamation claim, Orbital failed to establish that communication of the talking points memo is subject to a privilege. Orbital does not explain why distribution of the talking points memo to other executives, including a "small transition team," does not represent "publication" for purposes of a defamation claim.[10] *See Keddie v. Pennsylvania State Univ.*, 412 F. Supp. 1264, 1276 (M.D. Pa. 1976) ("In order to create liability for defamation there must be publication to a person other than the plaintiff."); *Agriss v. Roadway Exp., Inc.*, 483 A.2d 456, 462-64 (Pa. Super. 1984) (truck driver who was given a warning letter falsely accusing him of "opening company mail" stated a claim for defamation because the statement was capable of defamatory meaning and was published by being circulated among his fellow employees, beyond parties entitled to receive it under the collective bargaining agreement); *AMI Affiliates, Inc. v. U.S. of Hous. & Urb. Dev.*, 1995 WL 752387, at *4 (E.D. Pa. Dec. 15, 1995) ("statements made to employees can serve as publication for purposes of a defamation action.") As discussed, it has not been conclusively shown that the

---

[10] At oral argument, Orbital affirmatively responded when it was asked if it was contending that some sort of privilege applied to distribution to other company executives, but it has provided no authority to support this position, nor has the Court independently found any. In fact, the caselaw appears to be to the contrary. *See Rudolph v. Safari Club Int'l*, 2018 WL 3145716, at *7 (W.D. Pa. June 27, 2018) (Eddy, M.J.) (rejecting defendant's argument, based on two unpublished cases from the Court of Appeals for the Tenth Circuit applying Colorado and Oklahoma state law, that circulation of a statement within an organization does not constitute publication to state a claim for defamation).

persons to whom the talking points memo was distributed had a need to know the wide-ranging issues included within it.

Thus, as the evidence shows that there was publication of the talking points memo to Orbital executives, the jury must conclude if they understood its content to be defamatory. In addition, the Grelewicz declaration[11] also creates a genuine issue of material fact about whether defamatory information, including content from the talking points memo, was published to other Orbital employees. Thus, there is evidence in the record to support the element of publication.

Orbital argues that Buchko cannot show that what Grelewicz heard was capable of a defamatory meaning because Grelewicz himself did not accept it as true. In support of its contention, Orbital cites *Milione v. Hahnemann Univ.*, 1992 WL 57670 (E.D. Pa. Mar. 18, 1992), in which the plaintiff tried to establish that a defamatory statement had been made by submitting the affidavit of a friend who, posing as a prospective employer, called plaintiff's former supervisor for a reference. The court found that the statement was not capable of defamatory meaning because the supervisor merely thought that the plaintiff was not a good employee and the friend did not believe the statement. *Id.* at *4. *See also Rentzell v. Dollar Tree Stores, Inc.*, 2012 WL 707005, at *4 (E.D. Pa. Mar. 5, 2012) (no defamatory meaning when plaintiff hired a private investigator to make a reference call).

These cases are distinguishable. First, Otis did not merely tell Grelewicz that he was not a

---

[11] Orbital argues in a footnote that the Court should disregard the Grelewicz declaration because he resides and works in Indiana, outside the Court's subpoena power, and because he does not indicate that he would be willing to testify at trial. But it cites no authority in support of this argument. As Judge Conti has observed: "Without evidence indicating that a witness is unwilling or unable to testify at trial, however, a court should be cautious to presume a witness will not appear; instead, the better approach is to recognize that witnesses have and will appear here without having to be subpoenaed." *York Grp., Inc. v. Pontone*, 2014 WL 3735157, at *10 (W.D. Pa. July 28, 2014) (citation omitted).

good employee. Rather, as described, Otis made several negative allegations about Buchko's workplace conduct. Moreover, Grelewicz understood the defamatory meaning of Otis's statements and specifically as intended to be applied to Buchko. He concluded that Otis was suggesting a pattern of deliberate activity by Buchko for the purpose of undermining the company. (ECF No. 224 Ex. DDD ¶ 21.) Contrary to Orbital's implication, Pennsylvania law does not require Buchko to show that Grelewicz accepted the allegations against him as true or that they caused Grelewicz to think less of him. *See Sprague v. American Bar Ass'n*, 276 F. Supp. 2d 365, 370 (E.D. Pa. 2003) (plaintiff supported his claim that his reputation was harmed by citing testimony from witnesses who knew him personally and did not believe the defamatory statements but were outraged by them, thereby supporting an inference that people who did not know him personally and read the article would have no reason to disbelieve the statements). More importantly, Grelewicz's declaration, the only evidence in the record elicited from him, includes no representation about whether he believed what he was told was true.

Thus, under Pennsylvania law, the jury must determine whether the recipients of Orbital's communications understood statements about Buchko to be defamatory.

Orbital also contends that Buchko has failed to point to special harm. "As a rule, except as to allegations of slander per se, plaintiffs in slander actions must allege special damages beyond an injury to reputation." *Beverly Enterprises, Inc. v. Trump*, 182 F.3d 183, 188 (3d Cir. 1999). However, both the Otis statements cited in the Grelewicz declaration and the talking points memo include accusations of business misconduct and possible criminal conduct, including financial fraud, and thus constitute defamation per se. *See id.* (slander per se includes words imputing the commission of a criminal offense and business misconduct). A plaintiff who alleges defamation per se need not establish special harm. *Clemente*, 749 F. Supp. at 677. Thus, if Buchko can prove

defamation per se, he need not establish special harm.

Thus, with respect to the defamation counterclaim, Orbital's motion for summary judgment will be denied.

E. Bonus Claim

In both the breach of contract and WPCL counterclaims, Buchko seeks payment of a bonus to which he claims to be entitled. Orbital contends that it is entitled to summary judgment on these claims because Buchko was terminated before the end of the fiscal year and before bonuses were calculated or due.

The NCA provides that Buchko has "eligibility to participate in the Company's bonus plan as defined and promulgated by Company's CFO." (PCSMF ¶ 5.) Orbital contends that Otis defined and promulgated a bonus plan in 2018 and that to be eligible to receive a bonus, an employee must be employed by Orbital when the bonuses are calculated and paid. For the fiscal year ended March 31, 2020, the bonuses were calculated and processed on April 17, 2020, but because Buchko had been terminated on March 2, 2020, Orbital contends that he was not eligible for a bonus. (PCSMF ¶¶ 36-38, 40, 42-43.)

Buchko claims that his bonus plan was independent of that of anyone else at Orbital, including the general managers, and had a defined method of calculation. The only two documents in the record that discuss Buchko's bonus are the NCA and Otis's internal memo summarizing the parties' negotiations in May 2018 before the NCA was signed. Neither of these documents state that Buchko had to be employed on the date the bonuses were calculated to be eligible to receive one. *See also id.* ¶ 119 (noting that the bonus plan for the GMs is in writing, unlike Buchko's). Moreover, the NCA explicitly provides that it can only be modified in writing. (DRPCSMF ¶¶ 36-38, 40, 42-43.) That the prior year's bonus was paid after the fiscal year does not conclusively

show that the bonus could not be calculated as of the date of Buchko's termination or that Orbital

had an existing requirement related to Buchko that no bonus would be paid if termination occurs

before the end of the fiscal year.

The NCA is governed by Pennsylvania law. (ECF No. 224 Ex. A § 8.) As the WPCL

provides: "Whenever an employer separates an employe from the payroll, or whenever an employe

quits or resigns his employment, the wages or compensation earned shall become due and payable

not later than the next regular payday of his employer on which such wages would otherwise be

due and payable." 43 P.S. § 260.5(a). The WPCL defines wages as "all earnings of an employe,

regardless of whether determined on time, task, piece, commission or other method of calculation.

The term 'wages' also includes fringe benefits or wage supplements whether payable by the

employer from his funds or from amounts withheld from the employes' pay by the employer." 43

P.S. § 260.2a. "The contract between the parties governs in determining whether specific wages

are earned." *Weldon v. Kraft, Inc.*, 896 F.2d 793, 801 (3d Cir. 1990).

"Bonus payments are recoverable under the WPCL." *Blackwell-Murray v. PNC Bank*, 963

F. Supp. 2d 448, 470 (E.D. Pa. 2013). "The burden falls on Plaintiff, however, to prove that the

bonus is 'earned,' i.e. that the right to the wage or bonus vested under the terms of employment.

Where a bonus or incentive requires that an employee be actually employed by the employer at

the time the payment comes due, the employee has not earned that bonus or incentive." *Id.*

(citations omitted). "[t]he mere fact that certain compensation is not payable until a future date is

not necessarily fatal to a WPCL claim so long as the employee is deemed to have 'earned' it during

his employment." *Id.* (citing *Riseman v. Advanta Corp.*, 39 F. App'x 761, 765 (3d Cir. 2002)).

In *Blackwell-Murray*, the contract explicitly provided that employees had to be employed

on "active" status on the payroll processing date to receive a bonus. The plaintiff in that case failed

to demonstrate that he met his performance goals to be eligible for a bonus and, in addition, was not employed on the payroll processing date. Thus, his claim for a bonus was dismissed. *Id.* at 471-72. *See also Lenhart v. Huntington Ins., Inc.*, 2016 WL 3579050, at \*6 (W.D. Pa. June 8, 2016) (employee could not state a claim for a bonus when the incentive plan stated that it would not be paid if the employee is no longer employed on the designated date), *report and recommendation adopted*, 2016 WL 3522043 (W.D. Pa. June 28, 2016).

The NCA provides that Buchko was eligible to participate in Orbital's bonus plan "as defined and promulgated by" Otis, Orbital's CFO. Orbital has identified no provision in the NCA or any other writing that required Buchko to be employed on the date bonuses were calculated. Orbital cites *Banks Engineering Co. v. Polons*, 697 A.2d 1020, 1023 (Pa. Super. 1997) for the proposition that when a contract is silent about the details of a bonus, a court cannot rewrite the agreement to fill in a missing piece. But it is Orbital that is trying to add a limiting term to his eligibility for a bonus: that Buchko had to be employed by Orbital at the end of the fiscal year to qualify for a bonus.

Orbital has not produced a written policy or other document in which Otis defined and promulgated a bonus policy that applied to Buchko or that states that he must be employed to receive a bonus. In addition, there is no conclusive evidence that Buchko was told that he must still be employed to be "eligible" as referenced in the NCA. Instead, Orbital proffered a declaration written by Otis for use in this litigation regarding Buchko's bonus (PCSMF ¶ 40, citing Otis Decl. ¶ 9) (PRDCSMF ¶¶ 115-16.) Without any other evidence, the resolution of the bonus policy as it applied to Buchko necessarily depends on Otis's credibility, which can be assessed only by the jury. As a result, the existence of disputed facts about whether Bucko is entitled to a bonus despite his termination requires that Orbital's motion for summary judgment about this issue be denied.

F.  Unused Vacation Time Claim

Buchko seeks his unused vacation time. Orbital contends that neither the NCA nor the 2019 Employee Handbook require this payment.

The 2016 Employee Handbook states that "[u]pon termination, the employee will receive payment for the balance of unused earned vacation time through the end of the pay period in which their termination date falls." (DRPCSMF ¶ 123; ECF No. 224 Ex. JJJ at 26 § 3.5.) By contrast, the 2019 Employee Handbook changes this policy, providing that "[u]pon separation from employment with Orbital Engineering, Inc., the general rule is that accrued (but unused) PTO will NOT be paid out to the employee." (PCSMF ¶ 51; ECF No. 169 Ex. 11 at 32 § 3.4.)

Buchko signed the NCA on May 29, 2018, while the 2016 Employee Handbook was in effect. The NCA specifically references the 2016 Employee Handbook, although in a different context. The NCA may only be modified or amended by written agreement signed by an Orbital office and Buchko. (ECF No. 224 Ex. A ¶ 9(c).) No such amendment ever occurred. Thus, it is up to the jury to determine whether Buchko is bound by the terms of a handbook that was created after he signed the NCA and was never incorporated into its terms.

Thus, with respect to Buchko's claim for his unused vacation time, Orbital's motion for summary judgment will be denied.

G.  Damages

In his Amended Counterclaims, Buchko seeks to recover extracontractual damages, including "[l]ost wages, lost business and professional opportunities and/or business and/or professional revenue" and "general compensatory damages including, but not limited to, pain, suffering, inconvenience, mental anguish, [and] loss of enjoyment of life." He also requests punitive damages. (ECF No. 36 at 23.)

Orbital contends that Buchko cannot recover extracontractual damages because the NCA limits his recovery to six months of wages and six months of COBRA. And, it argues, he has not identified any "pain, suffering, inconvenience, mental anguish [and] loss of enjoyment of life," vaguely claims damages related to jobs he did not obtain and claims his reputation has been "ruined . . . in the general industry." (PCSMF ¶¶ 53-57.) Moreover, Orbital argues, recovery for emotional harm requires physical injury and medical evidence which has not been proffered.

Buchko asserts that he is entitled to extracontractual damages for his tort-based claims, that he has detailed the basis for pain, suffering and related damages, and that his harm is ongoing as shown by Orbital's demand that JRJE terminate his employment, thus forestalling this opportunity. (DRPCSMF ¶¶ 53-57.)

The NCA provides for "six months of salary and six months of COBRA healthcare coverage if [Buchko] is terminated, unless for gross negligence of intentional or willful misconduct." (ECF No. 224 Ex. A at 1.) These contractual damages would "return [him] to the position [he] would have been in but for the breach." *Birth Ctr. v. St. Paul Companies, Inc.*, 787 A.2d 376, 385 (Pa. 2001). "As a general rule, punitive damages are not recoverable in an action for breach of contract. Similarly, damages for emotional distress are not ordinarily allowed in actions for breach of contract [unless] . . . the emotional distress accompanies bodily injury [or] . . . where the breach is of such a type that serious emotional disturbance is a particularly likely result." *Rittenhouse Regency Affiliates v. Passen*, 482 A.2d 1042, 1043 (Pa. Super. 1984) (citations omitted). *See also Walkup v. Santander Bank, N.A.*, 147 F. Supp. 3d 349, 364 (E.D. Pa. 2015). Thus, Buchko cannot recover damages for emotional distress or punitive damages if he prevails on his contract action.

At the same time, Buchko has also asserted tort claims of tortious interference and

defamation, and these claims have not been dismissed. Thus, it is premature to exclude any recoverable damages related to these claims at this point.

Orbital argues that "at the very least, existence of the alleged emotional distress must be supported by competent medical evidence." *Kazatsky v. King David Mem'l Park, Inc.*, 527 A.2d 988, 995 (Pa. 1987). However, that case concerned a claim of intentional infliction of emotional distress, not claims for defamation and tortious interference. Orbital provided no authority to support its assertion that damages for emotional distress in these torts must be supported by medical evidence.

To recover damages for a claim of intentional interference with contractual relations, a plaintiff must first prove an actual pecuniary loss. *Shiner v. Moriarty*, 706 A.2d 1228, 1239 (Pa. Super. 1998). Once a pecuniary loss is established, non-pecuniary losses are also recoverable. *Id.* Pursuant to the Restatement (Second) of Torts, damages for tortious interference with contractual relations can include "emotional distress or actual harm to reputation, if they are reasonably to be expected to result from the interference." Restatement (Second) of Torts § 774A(1)(c) (1979). *See Pelagatti,* 536 A.2d at 1343 ("As for [the plaintiff'] claim that the alleged interference harmed his business reputation, the gravamen of this tort is the lost pecuniary benefits flowing from the contract itself; other losses, such as emotional distress and loss of reputation, are consequential harms.")

Similarly, Buchko may seek non-pecuniary damages in a defamation per se claim. *See Sprague*, 276 F. Supp. 2d at 368 (plaintiff may recover presumed damages and actual general damages that typically flow from defamation, such as "impairment of reputation and standing in the community, personal humiliation, and mental anguish and suffering."); *Joseph v. Scranton Times L.P.*, 129 A.3d 404, 429 n.10 (Pa. 2015) ("Pennsylvania case law holds that proof of special

harm, i.e., monetary damages, is not a prerequisite to recovery in a defamation libel matter.")

Thus, with respect to Buchko's claim for extra-contractual damages related to his intentional interference and defamation claims, Orbital's motion for summary judgment will be denied. Whether Buchko is entitled to and proves such damages are issues that must be resolved at trial.

Orbital's assertion that Buchko is barred from seeking punitive damages is also unavailing at this stage. "Punitive damages may be awarded for conduct that is outrageous, because of the defendant's evil motive or his reckless indifference to the rights of others." *Hutchison ex rel. Hutchison v. Luddy*, 870 A.2d 766, 770 (Pa. 2005) (quoting *Feld v. Merriam*, 485 A.2d 742, 747 (Pa. 1984). See also Restatement (Second) of Torts § 908(2) (1979). "As the name suggests, punitive damages are penal in nature and are proper only in cases where the defendant's actions are so outrageous as to demonstrate willful, wanton or reckless conduct." *Id.* at 770. "[I]n Pennsylvania, a punitive damages claim must be supported by evidence sufficient to establish that (1) a defendant had a subjective appreciation of the risk of harm to which the plaintiff was exposed and that (2) he acted, or failed to act, as the case may be, in conscious disregard of that risk." *Id.* at 772.

The Pennsylvania Supreme Court "has stressed that, when assessing the propriety of the imposition of punitive damages, '[t]he state of mind of the actor is vital." *Id.* at 770 (quoting *Feld*, 485 A.2d at 748). As Judge Horan has noted: "To prove a claim of Tortious Interference with a Contract requires a showing that the defendant engaged in intentional and improper conduct intending to harm an existing relationship." *Armstrong Telecommunications, Inc. v. CHR Sols., Inc.*, 2019 WL 3719487, at *8 (W.D. Pa. Aug. 7, 2019). "Under Pennsylvania law, punitive damages may be awarded even when the plaintiff cannot recover compensatory damages." *Fishkin*

*v. Susquehanna Partners, G.P.*, 563 F. Supp. 2d 547, 591 (E.D. Pa. 2008), *aff'd in part*, 340 F. App'x 110 (3d Cir. 2009).

The Court finds that a determination of whether Buchko may have a right to punitive damages if he prevails on certain claims at trial is premature. He has provided sufficient evidence that, if accepted by the trier of fact, could lead to a conclusion that Orbital intentionally engaged in conduct intended to harm his relationship with JRJE and that it engaged in willful, wanton or reckless conduct when it published defamatory information about him. As a result, with respect to Buchko's request for punitive damages, the motion for summary judgment will be denied.

For these reasons, Plaintiff's Motion for Partial for Summary Judgment (ECF No. 161) will be granted as it relates to certain aspects of Buchko's intentional interference with contractual relations claim and otherwise denied.

An appropriate order follows.

BY THE COURT:

/s/Patricia L. Dodge
PATRICIA L. DODGE
United States Magistrate Judge

Dated: November 12, 2021